U.S. Supreme Court

SANTA CLARA PUEBLO v. MARTINEZ, 436 U.S. 49 (1978)

436 U.S. 49

SANTA CLARA PUEBLO ET AL. v. MARTINEZ ET AL.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 76-682.

Argued November 29, 1977
Decided May 15, 1978

Respondents, a female member of the Santa Clara Pueblo and her daughter, brought this action for declaratory and injunctive relief against petitioners, the Pueblo and its Governor, alleging that a Pueblo ordinance that denies tribal membership to the children of female members who marry outside the tribe, but not to similarly situated children of men of that tribe, violates Title I of the Indian Civil Rights Act of 1968 (ICRA), 25 U.S.C. 1301-1303, which in relevant part provides that "[n]o Indian tribe in exercising powers of self-government shall . . . deny to any person within its jurisdiction the equal protection of its laws." 25 U.S.C. 1302 (8). The ICRA's only express remedial provision, 25 U.S.C. 1303, extends the writ of habeas corpus to any person, in a federal court, "to test the legality of his detention by order of an Indian tribe." The District Court held that jurisdiction was conferred by 28 U.S.C. 1343 (4) and 25 U.S.C. 1302 (8), apparently concluding that the substantive provisions of Title I impliedly authorized civil actions for declaratory and injunctive relief, and also that the tribe was not immune from such a suit. Subsequently, the court found for petitioners on the merits. The Court of Appeals, while agreeing on the jurisdictional issue, reversed on the merits. Held:

> 1. Suits against the tribe under the ICRA are barred by the tribe's sovereign immunity from suit, since nothing on the face of the ICRA purports to subject tribes to the jurisdiction of federal courts in civil actions for declaratory or injunctive relief. Pp. 58-59.
> 2. Nor does 1302 impliedly authorize a private cause of action for declaratory and injunctive relief against the Pueblo's Governor. Congress' failure to provide remedies other than habeas corpus for enforcement of the ICRA was deliberate, as is manifest from the structure of the statutory scheme and the legislative history of Title I. Pp. 59-72.
> (a) Congress was committed to the goal of tribal self-determination, as is evidenced by the provisions of Title I itself. Section 1302 selectively incorporated and in some instances modified the safeguards of the Bill of Rights to fit the unique needs of tribal governments, and other parts of the ICRA similarly manifest a congressional purpose to protect tribal sovereignty from undue interference. Creation of a federal cause [436 U.S. 49, 50] of action for the enforcement of 1302 rights would not comport with the congressional goal of protecting tribal self-government. Pp. 62-65.
> (b) Tribal courts, which have repeatedly been recognized as appropriate forums for adjudicating disputes involving important interests of both Indians and non-Indians, are available to vindicate rights created by the ICRA. Pp. 65-66.
> (c) After considering numerous alternatives for review of tribal criminal convictions, Congress apparently decided that review by way of habeas corpus would adequately protect the individual interests at stake while avoiding unnecessary intrusions on tribal governments. Similarly, Congress considered and rejected proposals for federal review of alleged violations of the ICRA arising in a civil context. It is thus clear that only the limited review mechanism of 1303 was contemplated. Pp. 66-70.
> (d) By not exposing tribal officials to the full array of federal remedies available to redress actions of federal and state officials, Congress may also have considered that resolution of statutory issues under 1302, and particularly those issues likely to arise in a civil context, will frequently depend

on questions of tribal tradition and custom that tribal forums may be in a better position to evaluate than federal courts. Pp. 71-72.

540 F.2d 1039, reversed.

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, POWELL, and STEVENS, JJ., joined, and in all but Part III of which REHNQUIST, J., joined. WHITE, J., filed a dissenting opinion, post, p. 72. BLACKMUN, J., took no part in the consideration or decision of the case.

Marcelino Prelo argued the cause and filed briefs for petitioners.

Richard B. Collins argued the cause for respondents. With him on the brief was Alan R. Taradash. *

[ Footnote * ] Briefs of amici curiae urging reversal were filed by George B. Christensen and Joseph S. Fontana for the National Tribal Chairmen's Assn.; and by Reid Peyton Chambers, Harry R. Sachse, and Glen A. Wilkinson for the Shoshone and Arapahoe Tribes of the Wind River Indian Reservation et al.

Stephen L. Pevar and Joel M. Gora filed a brief for the American Civil Liberties Union as amicus curiae urging affirmance.

Briefs of amici curiae were filed by Alvin J. Ziontz for the Confederated [436 U.S. 49, 51]   Tribes of the Colville Indian Reservation; and by Philip R. Ashby, William C. Schaab, L. Lamar Parrish, and Richard B. Wilks for the Pueblo de Cochiti et al. [436 U.S. 49, 51]

MR. JUSTICE MARSHALL delivered the opinion of the Court.Fn

This case requires us to decide whether a federal court may pass on the validity of an Indian tribe's ordinance denying membership to the children of certain female tribal members.

Petitioner Santa Clara Pueblo is an Indian tribe that has been in existence for over 600 years. Respondents, a female member of the tribe and her daughter, brought suit in federal court against the tribe and its Governor, petitioner Lucario Padilla, seeking declaratory and injunctive relief against enforcement of a tribal ordinance denying membership in the tribe to children of female members who marry outside the tribe, while extending membership to children of male members who marry outside the tribe. Respondents claimed that this rule discriminates on the basis of both sex and ancestry in violation of Title I of the Indian Civil Rights Act of 1968 (ICRA), 25 U.S.C. 1301-1303, which provides in relevant part that "[n]o Indian tribe in exercising powers of self-government shall . . . deny to any person within its jurisdiction the equal protection of its laws." 1302 (8). 1

Title I of the ICRA does not expressly authorize the bringing of civil actions for declaratory or injunctive relief to [436 U.S. 49, 52]   enforce its substantive provisions. The threshold issue in this case is thus whether the Act may be interpreted to impliedly authorize such actions, against a tribe or its officers, in the federal courts. For the reasons set forth below, we hold that the Act cannot be so read.

I

Respondent Julia Martinez is a full-blooded member of the Santa Clara Pueblo, and resides on the Santa Clara Reservation in Northern New Mexico. In 1941 she married a Navajo Indian with whom she has since had several children, including respondent Audrey Martinez. Two years before this marriage, the Pueblo passed the membership ordinance here at issue, which bars admission of the Martinez children to the tribe because their father is not a Santa Claran. 2 Although the children were raised on the reservation and continue to reside there now that they are adults, as a result of their exclusion from membership they may not vote in tribal elections or hold secular office in the tribe; moreover, they have no right to remain on the

reservation in the event of their [436 U.S. 49, 53] mother's death, or to inherit their mother's home or her possessory interests in the communal lands.

After unsuccessful efforts to persuade the tribe to change the membership rule, respondents filed this lawsuit in the United States District Court for the District of New Mexico, on behalf of themselves and others similarly situated. 3 Petitioners moved to dismiss the complaint on the ground that the court lacked jurisdiction to decide intratribal controversies affecting matters of tribal self-government and sovereignty. The District Court rejected petitioners' contention, finding that jurisdiction was conferred by 28 U.S.C. 1343 (4) and 25 U.S.C. 1302 (8). The court apparently concluded, first, that the substantive provisions of Title I impliedly authorized civil actions for declaratory and injunctive relief, and second, that the tribe was not immune from such suit. 4 Accordingly, the motion to dismiss was denied. 402 F. Supp. 5 (1975).

Following a full trial, the District Court found for petitioners on the merits. While acknowledging the relatively recent origin of the disputed rule, the District Court nevertheless [436 U.S. 49, 54] found it to reflect traditional values of patriarchy still significant in tribal life. The court recognized the vital importance of respondents' interests, 5 but also determined that membership rules were "no more or less than a mechanism of social . . . self-definition," and as such were basic to the tribe's survival as a cultural and economic entity. Id., at 15. 6 In sustaining the ordinance's validity under the "equal protection clause" of the ICRA, 25 U.S.C. 1302 (8), the District Court concluded that the balance to be struck between these competing interests was better left to the judgment of the Pueblo:

> "[T]he equal protection guarantee of the Indian Civil Rights Act should not be construed in a manner which would require or authorize this Court to determine which traditional values will promote cultural survival and should therefore be preserved . . . . Such a determination should be made by the people of Santa Clara; not only because they can best decide what values are important, but also because they must live with the decision every day . . . .
> ". . . To abrogate tribal decisions, particularly in the delicate area of membership, for whatever `good' reasons, is to destroy cultural identity under the guise of saving it." 402 F. Supp., at 18-19.

On respondents' appeal, the Court of Appeals for the Tenth Circuit upheld the District Court's determination that 28 U.S.C. 1343 (4) provides a jurisdictional basis for actions [436 U.S. 49, 55] under Title I of the ICRA. 540 F.2d 1039, 1042 (1976). It found that "since [the ICRA] was designed to provide protection against tribal authority, the intention of Congress to allow suits against the tribe was an essential aspect [of the ICRA]. Otherwise, it would constitute a mere unenforceable declaration of principles." Ibid. The Court of Appeals disagreed, however, with the District Court's ruling on the merits. While recognizing that standards of analysis developed under the Fourteenth Amendment's Equal Protection Clause were not necessarily controlling in the interpretation of this statute, the Court of Appeals apparently concluded that because the classification was one based upon sex it was presumptively invidious and could be sustained only if justified by a compelling tribal interest. See id., at 1047-1048. Because of the ordinance's recent vintage, and because in the court's view the rule did not rationally identify those persons who were emotionally and culturally Santa Clarans, the court held that the tribe's interest in the ordinance was not substantial enough to justify its discriminatory effect. Ibid.

We granted certiorari, 431 U.S. 913 (1977), and we now reverse.

## II

Indian tribes are "distinct, independent political communities, retaining their original natural rights" in matters of local self-government. Worcester v. Georgia, 6 Pet. 515, 559 (1832); see United States v. Mazurie, 419 U.S. 544, 557 (1975); F. Cohen, Handbook of Federal Indian Law 122-123 (1945). Although no longer "possessed of the full attributes of sovereignty," they remain a "separate people, with the power of regulating their internal and social relations." United States v. Kagama, 118 U.S. 375, 381 -382 (1886). See United States v. Wheeler, 435 U.S. 313 (1978). They have power to make their own substantive law in internal matters, see Roff v. Burney, 168 U.S. 218 (1897) (membership); [436 U.S. 49, 56] Jones v. Meehan, 175 U.S. 1, 29 (1899) (inheritance rules); United States v. Quiver, 241 U.S. 602 (1916) (domestic relations), and to enforce that law in their own forums, see, e. g., Williams v. Lee, 358 U.S. 217 (1959).

As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority. Thus, in Talton v. Mayes, 163 U.S. 376 (1896), this Court held that the Fifth Amendment did not "operat[e] upon" "the powers of local self-government enjoyed" by the tribes. Id., at 384. In ensuing years the lower federal courts have extended the holding of Talton to other provisions of the Bill of Rights, as well as to the Fourteenth Amendment. 7

As the Court in Talton recognized, however. Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess. Ibid. See, e. g., United States v. Kagama, supra, [436 U.S. 49, 57]   at 379-381, 383-384; Cherokee Nation v. Hitchcock, 187 U.S. 294, 305 -307 (1902). Title I of the ICRA, 25 U.S.C. 1301-1303, represents an exercise of that authority. In 25 U.S.C. 1302, Congress acted to modify the effect of Talton and its progeny by imposing certain restrictions upon tribal governments similar, but not identical, to those contained in the Bill of Rights and the Fourteenth Amendment. 8   [436 U.S. 49, 58]   In 25 U.S.C. 1303, the only remedial provision expressly supplied by Congress, the "privilege of the writ of habeas corpus" is made "available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe."

Petitioners concede that 1302 modifies the substantive law applicable to the tribe; they urge, however, that Congress did not intend to authorize federal courts to review violations of its provisions except as they might arise on habeas corpus. They argue, further, that Congress did not waive the tribe's sovereign immunity from suit. Respondents, on the other hand, contend that 1302 not only modifies the substantive law applicable to the exercise of sovereign tribal powers, but also authorizes civil suits for equitable relief against the tribe and its officers in federal courts. We consider these contentions first with respect to the tribe.

### III

Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers. Turner v. United States, 248 U.S. 354, 358 (1919); United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 512 -513 (1940); Puyallup Tribe v. Washington Dept. of Game, 433 U.S. 165, 172 -173 (1977). This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But "without congressional authorization," the "Indian Nations are exempt from suit." United States v. United States Fidelity & Guaranty Co., supra, at 512.

It is settled that a waiver of sovereign immunity "`cannot be implied but must be unequivocally expressed.'" United States v. Testan, 424 U.S. 392, 399 (1976), quoting, United [436 U.S. 49, 59]   States v. King, 395 U.S. 1, 4 (1969). Nothing on the face of Title I of the ICRA purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief. Moreover, since the respondent in a habeas corpus action is the individual custodian of the prisoner, see, e. g., 28 U.S.C. 2243, the provisions of 1303 can hardly be read as a general waiver of the tribe's sovereign immunity. In the absence here of any unequivocal expression of contrary legislative intent, we conclude that suits against the tribe under the ICRA are barred by its sovereign immunity from suit.

### IV

As an officer of the Pueblo, petitioner Lucario Padilla is not protected by the tribe's immunity from suit. See Puyallup Tribe v. Washington Dept. of Game, supra, at 171-172; cf. Ex parte Young, 209 U.S. 123 (1908). We must therefore determine whether the cause of action for declaratory and injunctive relief asserted here by respondents, though not expressly authorized by the statute, is nonetheless implicit in its terms.

In addressing this inquiry, we must bear in mind that providing a federal forum for issues arising under 1302 constitutes an interference with tribal autonomy and self-government beyond that created by the change in substantive law itself. Even in matters involving commercial and domestic relations, we have

recognized that "subject[ing] a dispute arising on the reservation among reservation Indians to a forum other than the one they have established for themselves," Fisher v. District Court, 424 U.S. 382, 387 -388 (1976), may "undermine the authority of the tribal cour[t] . . . and hence . . . infringe on the right of the Indians to govern themselves." Williams v. Lee, 358 U.S., at 223 . 9   [436 U.S. 49, 60]   A fortiori, resolution in a foreign forum of intratribal disputes of a more "public" character, such as the one in this case, cannot help but unsettle a tribal government's ability to maintain authority. Although Congress clearly has power to authorize civil actions against tribal officers, and has done so with respect to habeas corpus relief in 1303, a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent. Cf. Antoine v. Washington, 420 U.S. 194, 199 -200 (1975); Choate v. Trapp, 224 U.S. 665, 675 (1912).

With these considerations of "Indian sovereignty . . . [as] a backdrop against which the applicable . . . federal statut[e] must be read," McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 172 (1973), we turn now to those factors of more general relevance in determining whether a cause of action is implicit in a statute not expressly providing one. See Cort v. Ash, 422 U.S. 66 (1975). 10 We note at the outset that [436 U.S. 49, 61]   a central purpose of the ICRA and in particular of Title I was to "secur[e] for the American Indian the broad constitutional rights afforded to other Americans," and thereby to "protect individual Indians from arbitrary and unjust actions of tribal governments." S. Rep. No. 841, 90th Cong., 1st Sess., 5-6 (1967). There is thus no doubt that respondents, American Indians living on the Santa Clara Reservation, are among the class for whose especial benefit this legislation was enacted. Texas & Pacific R. Co. v. Rigsby, 241 U.S. 33, 39 (1916); see Cort v. Ash, supra, at 78. Moreover, we have frequently recognized the propriety of inferring a federal cause of action for the enforcement of civil rights, even when Congress has spoken in purely declarative terms. See, e. g., Jones v. Alfred H. Mayer Co., 392 U.S. 409, 414 n. 13 (1968); Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 238 -240 (1969). See also Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971). These precedents, however, are simply not dispositive here. Not only are we unpersuaded that a judicially sanctioned intrusion into tribal sovereignty is required to fulfill the purposes of the ICRA, but to the contrary, the structure of the statutory scheme and the legislative history of Title I suggest that Congress' failure to provide remedies other than habeas corpus was a deliberate one. See National Railroad Passenger Corp. v. National [436 U.S. 49, 62]   Assn. of Railroad Passengers, 414 U.S. 453 (1974); Cort v. Ash, supra.

A

Two distinct and competing purposes are manifest in the provisions of the ICRA: In addition to its objective of strengthening the position of individual tribal members vis-a-vis the tribe, Congress also intended to promote the well-established federal "policy of furthering Indian self-government." Morton v. Mancari, 417 U.S. 535, 551 (1974); see Fisher v. District Court, 424 U.S., at 391 . 11 This commitment to the goal of tribal self-determination is demonstrated by the provisions of Title I itself. Section 1302, rather than providing in wholesale fashion for the extension of constitutional requirements to tribal governments, as had been initially proposed, 12 selectively incorporated and in some instances modified the safeguards of the Bill of Rights to fit the unique political, cultural, and economic needs of tribal [436 U.S. 49, 63]   governments. 13 See n. 8, supra. Thus, for example, the statute does not prohibit the establishment of religion, nor does it require jury trials in civil cases, or appointment of counsel for indigents in criminal cases, cf. Argersinger v. Hamlin, 407 U.S. 25 (1972). 14

The other Titles of the ICRA also manifest a congressional purpose to protect tribal sovereignty from undue interference. For instance, Title III, 25 U.S.C. 1321-1326, hailed by some of the ICRA's supporters as the most important part of the Act, 15 provides that States may not assume civil or criminal jurisdiction over "Indian country" without [436 U.S. 49, 64]   the prior consent of the tribe, thereby abrogating prior law to the contrary. 16 Other Titles of the ICRA provide for strengthening certain tribal courts through training of Indian judges, 17 and for minimizing interference by the Federal Bureau of Indian Affairs in tribal litigation. 18

Where Congress seeks to promote dual objectives in a single statute, courts must be more than usually hesitant to infer from its silence a cause of action that, while serving one legislative purpose, will disserve

the other. Creation of a federal cause of action for the enforcement of rights created in Title I, however useful it might be in securing compliance with 1302, plainly would be at odds with the congressional goal of protecting tribal self-government. Not only would it undermine the authority of tribal forums, see supra, at 59-60, but it would also impose serious financial burdens on already "financially disadvantaged" tribes. Subcommittee on Constitutional Rights, Senate Judiciary Committee, Constitutional [436 U.S. 49, 65] Rights of the American Indian: Summary Report of Hearings and Investigations Pursuant to S. Res. 194, 89th Cong., 2d Sess., 12 (Comm. Print 1966) (hereinafter cited as Summary Report). 19

Moreover, contrary to the reasoning of the court below, implication of a federal remedy in addition to habeas corpus is not plainly required to give effect to Congress' objective of extending constitutional norms to tribal self-government. Tribal forums are available to vindicate rights created by the ICRA, and 1302 has the substantial and intended effect of changing the law which these forums are obliged to apply. 20 Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians. 21 See, e. g., Fisher v. District Court, 424 U.S. [436 U.S. 49, 66]   382 (1976); Williams v. Lee, 358 U.S. 217 (1959). See also Ex parte Crow Dog, 109 U.S. 556 (1883). Nonjudicial tribal institutions have also been recognized as competent law-applying bodies. See United States v. Mazurie, 419 U.S. 544 (1975). 22 Under these circumstances, we are reluctant to disturb the balance between the dual statutory objectives which Congress apparently struck in providing only for habeas corpus relief.

**B**

Our reluctance is strongly reinforced by the specific legislative history underlying 25 U.S.C. 1303. This history, extending over more than three years, 23 indicates that Congress' provision for habeas corpus relief, and nothing more, reflected a considered accommodation of the competing goals of "preventing injustices perpetrated by tribal governments, [436 U.S. 49, 67]   on the one hand, and, on the other, avoiding undue or precipitous interference in the affairs of the Indian people." Summary Report 11.

In settling on habeas corpus as the exclusive means for federal-court review of tribal criminal proceedings, Congress opted for a less intrusive review mechanism than had been initially proposed. Originally, the legislation would have authorized de novo review in federal court of all convictions obtained in tribal courts. 24 At hearings held on the proposed legislation in 1965, however, it became clear that even those in agreement with the general thrust of the review provision - to provide some form of judicial review of criminal proceedings in tribal courts - believed that de novo review would impose unmanageable financial burdens on tribal governments and needlessly displace tribal courts. See id., at 12; 1965 Hearings 22-23, 157, 162, 341-342. Moreover, tribal representatives argued that de novo review would "deprive the tribal court of all jurisdiction in the event of an appeal, thus having a harmful effect upon law enforcement within the reservation," and urged instead that "decisions of tribal courts . . . be reviewed in the U.S. district courts upon petition for a writ of habeas corpus." Id., at 79. After considering numerous alternatives for review of tribal convictions, Congress apparently decided that review by way of habeas corpus would adequately protect the individual interests at stake while avoiding unnecessary intrusions on tribal governments.

Similarly, and of more direct import to the issue in this case, Congress considered and rejected proposals for federal review of alleged violations of the Act arising in a civil context. As initially introduced, the Act would have required the Attorney General to "receive and investigate" complaints [436 U.S. 49, 68]   relating to deprivations of an Indian's statutory or constitutional rights, and to bring "such criminal or other action as he deems appropriate to vindicate and secure such right to such Indian." 25 Notwithstanding the screening effect this proposal would have had on frivolous or vexatious lawsuits, it was bitterly opposed by several tribes. The Crow Tribe representative stated:

> "This [bill] would in effect subject the tribal sovereignty of self-government to the Federal government. . . . [B]y its broad terms [it] would allow the Attorney General to bring any kind of action as he deems appropriate. By this bill, any time a member of the tribe would not be satisfied with an action by the [tribal] council, it would allow them [sic] to file a complaint with the

        Attorney General and subject the tribe to a multitude of investigations and threat of court action."
        1965 Hearings 235 (statement of Mr. Real Bird).
In a similar vein, the Mescalero Apache Tribal Council argued that "[i]f the perpetually dissatisfied individual Indian were to be armed with legislation such as proposed in [this bill] he could disrupt the whole of a tribal government." Id., at 343. In response, this provision for suit by the Attorney General was completely eliminated from the ICRA. At the same time, Congress rejected a substitute proposed by the Interior Department that would have authorized the Department to adjudicate civil complaints concerning tribal actions, with review in the district courts available from final decisions of the agency. 26   [436 U.S. 49, 69]

Given this history, it is highly unlikely that Congress would have intended a private cause of action for injunctive and declaratory relief to be available in the federal courts to secure enforcement of 1302. Although the only Committee Report on the ICRA in its final form, S. Rep. No. 841, 90th Cong., 1st Sess. (1967), sheds little additional light on this question, it would hardly support a contrary conclusion. 27 Indeed, its description of the purpose of Title I, 28 as well as the floor [436 U.S. 49, 70]   debates on the bill, 29 indicates that the ICRA was generally understood to authorize federal judicial review of tribal actions only through the habeas corpus provisions of 1303. 30 These factors, together with Congress' rejection of proposals that clearly would have authorized causes of action other than habeas corpus, persuade us that Congress, aware of the intrusive effect of federal judicial review upon tribal self-government, intended to create only a limited mechanism for such review, namely, that provided for expressly in 1303. [436 U.S. 49, 71]

V

As the bill's chief sponsor, Senator Ervin, 31 commented in urging its passage, the ICRA "should not be considered as the final solution to the many serious constitutional problems confronting the American Indian." 113 Cong. Rec. 13473 (1967). Although Congress explored the extent to which tribes were adhering to constitutional norms in both civil and criminal contexts, its legislative investigation revealed that the most serious abuses of tribal power had occurred in the administration of criminal justice. See ibid., quoting Summary Report 24. In light of this finding, and given Congress' desire not to intrude needlessly on tribal self-government, it is not surprising that Congress chose at this stage to provide for federal review only in habeas corpus proceedings.

By not exposing tribal officials to the full array of federal remedies available to redress actions of federal and state officials, Congress may also have considered that resolution of statutory issues under 1302, and particularly those issues likely to arise in a civil context, will frequently depend on questions of tribal tradition and custom which tribal forums may be in a better position to evaluate than federal courts. Our relations with the Indian tribes have "always been . . . anomalous . . . and of a complex character." United States v. Kagama, 118 U.S., at 381 . Although we early rejected the notion that Indian tribes are "foreign states" for jurisdictional purposes under Art. III, Cherokee Nation v. Georgia, 5 Pet. 1 (1831), we have also recognized that the tribes remain quasi-sovereign nations which, by government structure, culture, and source of sovereignty are in many ways foreign to the constitutional institutions of the Federal and State Governments. See Elk v. Wilkins, 112 U.S. 94 (1884). As is suggested by the District Court's opinion in this case, see supra, at 54, [436 U.S. 49, 72]   efforts by the federal judiciary to apply the statutory prohibitions of 1302 in a civil context may substantially interfere with a tribe's ability to maintain itself as a culturally and politically distinct entity. 32

As we have repeatedly emphasized, Congress' authority over Indian matters is extraordinarily broad, and the role of courts in adjusting relations between and among tribes and their members correspondingly restrained. See Lone Wolf v. Hitchcock, 187 U.S. 553, 565 (1903). Congress retains authority expressly to authorize civil actions for injunctive or other relief to redress violations of 1302, in the event that the tribes themselves prove deficient in applying and enforcing its substantive provisions. But unless and until Congress makes clear its intention to permit the additional intrusion on tribal sovereignty that adjudication of such actions in a federal forum would represent, we are constrained to find that 1302 does not impliedly authorize actions for declaratory or injunctive relief against either the tribe or its officers.

The judgment of the Court of Appeals is, accordingly,

Reversed.

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

Fn [436 U.S. 49, 51] MR. JUSTICE REHNQUIST joins Parts I, II, IV, and V of this opinion.

**Footnotes**

[ Footnote 1 ] The ICRA was initially passed by the Senate in 1967, 113 Cong. Rec. 35473, as a separate bill containing six Titles. S. 1843, 90th Cong., 1st Sess. (1967). It was re-enacted by the Senate in 1968 without change, 114 Cong. Rec. 5838, as an amendment to a House-originated bill, H. R. 2516, 90th Cong., 2d Sess. (1968), and was then approved by the House and signed into law by the President as Titles II through VII of the Civil Rights Act of 1968, Pub. L. 90-284, 82 Stat. 77. Thus, the first Title of the ICRA was enacted as Title II of the Civil Rights Act of 1968. The six Titles of the ICRA will be referred to herein by their title numbers as they appeared in the version of S. 1843 passed by the Senate in 1967.

[ Footnote 2 ] The ordinance, enacted by the Santa Clara Pueblo Council pursuant to its legislative authority under the Constitution of the Pueblo, establishes the following membership rules:

> "1. All children born of marriages between members of the Santa Clara Pueblo shall be members of the Santa Clara Pueblo.
> "2. . . . [C]hildren born of marriages between male members of the Santa Clara Pueblo and non-members shall be members of the Santa Clara Pueblo.
> "3. Children born of marriages between female members of the Santa Clara Pueblo and non-members shall not be members of the Santa Clara Pueblo.
> "4. Persons shall not be naturalized as members of the Santa Clara Pueblo under any circumstances."

Respondents challenged only subparagraphs 2 and 3. By virtue of subparagraph 4, Julia Martinez' husband is precluded from joining the Pueblo and thereby assuring the children's membership pursuant to subparagraph 1.

[ Footnote 3 ] Respondent Julia Martinez was certified to represent a class consisting of all women who are members of the Santa Clara Pueblo and have married men who are not members of the Pueblo, while Audrey Martinez was certified as the class representative of all children born to marriages between Santa Claran women and men who are not members of the Pueblo.

[ Footnote 4 ] Section 1343 (4) gives the district courts "jurisdiction of any civil action authorized by law to be commenced by any person . . . to secure equitable or other relief under any Act of Congress providing for the protection of civil rights" (emphasis added). The District Court evidently believed that jurisdiction could not exist under 1343 (4) unless the ICRA did in fact authorize actions for declaratory or injunctive relief in appropriate cases. For purposes of this case, we need not decide whether 1343 (4) jurisdiction can be established merely by presenting a substantial question concerning the availability of a particular form of relief. Cf. Bell v. Hood, 327 U.S. 678 (1946) (jurisdiction under 28 U.S.C. 1331). See also United States v. Memphis Cotton Oil Co., 288 U.S. 62, 67 -68 (1933) (Cardozo, J.).

[ Footnote 5 ] The court found that "Audrey Martinez and many other children similarly situated have been brought up on the Pueblo, speak the Tewa language, participate in its life, and are, culturally, for all practical purposes, Santa Claran Indians." 402 F. Supp., at 18.

[ Footnote 6 ] The Santa Clara Pueblo is a relatively small tribe. Approximately 1,200 members reside on the reservation; 150 members of the Pueblo live elsewhere. In addition to tribal members, 150-200 nonmembers live on the reservation.

[ Footnote 7 ] See, e. g., Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe, 370 F.2d 529, 533 (CA8 1967) (Due Process Clause of Fourteenth Amendment); Native American Church v. Navajo Tribal Council, 272 F.2d 131 (CA10 1959) (freedom of religion under First and Fourteenth Amendments); Barta v. Oglala Sioux Tribe, 259 F.2d 553 (CA8 1958), cert. denied, 358 U.S. 932 (1959) (Fourteenth Amendment). See also Martinez v. Southern Ute Tribe, 249 F.2d 915, 919 (CA10 1957), cert. denied, 356 U.S. 960 (1958) (applying Talton to Fifth Amendment due process claim); Groundhog v. Keeler, 442 F.2d 674, 678 (CA10 1971). But see Colliflower v. Garland, 342 F.2d 369 (CA9 1965), and Settler v. Yakima Tribal Court, 419 F.2d 486 (CA9 1969), cert. denied, 398 U.S. 903 (1970), both holding that where a tribal court was so pervasively regulated by a federal agency that it was in effect a federal instrumentality, a writ of habeas corpus would lie to a person detained by that court in violation of the Constitution.

The line of authority growing out of Talton, while exempting Indian tribes from constitutional provisions addressed specifically to State or Federal Governments, of course, does not relieve State and Federal Governments of their obligations to individual Indians under these provisions.

[ Footnote 8 ] Section 1302 in its entirety provides that:

> "No Indian tribe in exercising powers of self-government shall -
> "(1) make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;
> "(2) violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized;
> "(3) subject any person for the same offense to be twice put in jeopardy;
> "(4) compel any person in any criminal case to be a witness against himself;
> "(5) take any private property for a public use without just compensation;
> "(6) deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense;
> "(7) require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of six months or a fine of $500, or both;
> "(8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;
> "(9) pass any bill of attainder or ex post facto law; or
> "(10) deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons."

Section 1301 is a definitional section, which provides, inter alia, that the "powers of self-government" shall include "all governmental powers [436 U.S. 49, 58]   possessed by an Indian tribe, executive, legislative and judicial, and all offices, bodies, and tribunals by and through which they are executed . . . ." 25 U.S.C. 1301 (2).

[ Footnote 9 ] In Fisher, we held that a state court did not have jurisdiction over an adoption proceeding in which all parties were members of an Indian tribe and residents of the reservation. Rejecting the mother's argument that [436 U.S. 49, 60]   denying her access to the state courts constituted an impermissible racial discrimination, we reasoned:

> "The exclusive jurisdiction of the Tribal Court does not derive from the race of the plaintiff but rather from the quasi-sovereign status of the Northern Cheyenne Tribe under federal law . . . . [E]ven if a jurisdictional holding occasionally results in denying an Indian plaintiff a forum to which a non-Indian has access, such disparate treatment of the Indian is justified because it is

        intended to benefit the class of which he is a member by furthering the congressional policy of
        Indian self-government." 424 U.S., at 390 -391.
In Williams v. Lee, we held that a non-Indian merchant could not invoke the jurisdiction of a state court to collect a debt owed by a reservation Indian and arising out of the merchant's activities on the reservation, but instead must seek relief exclusively through tribal remedies.

[ Footnote 10 ] "First, is the plaintiff `one of the class for whose especial benefit the statute was enacted,' Texas & Pacific R. Co. v. Rigsby, 241 U.S. 33, 39 (1916) (emphasis supplied) - that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny [436 U.S. 49, 61]   one? See, e. g., National Railroad Passenger Corp. v. National Assn. of Railroad Passengers, 414 U.S. 453, 458 , 460 (1974) (Amtrak). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, e. g., Amtrak, supra; Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 423 (1975); Calhoon v. Harvey, 379 U.S. 134 (1964). And finally, is the cause of action one traditionally relegated to state [or tribal] law, in an area basically the concern of the States [or tribes], so that it would be inappropriate to infer a cause of action based solely on federal law?" Cort v. Ash, 422 U.S., at 78 .

See generally Note, Implication of Civil Remedies Under the Indian Civil Rights Act, 75 Mich. L. Rev. 210 (1976).

[ Footnote 11 ] One month before passage of the ICRA, President Johnson had urged its enactment as part of a legislative and administrative program with the overall goal of furthering "self-determination," "self-help," and "self-development" of Indian tribes. See 114 Cong. Rec. 5518, 5520 (1968).

[ Footnote 12 ] Exploratory hearings which led to the ICRA commenced in 1961 before the Subcommittee on Constitutional Rights of the Senate Judiciary Committee. In 1964, Senator Ervin, Chairman of the Subcommittee, introduced S. 3041-3048, 88th Cong., 2d Sess., on which no hearings were had. The bills were reintroduced in the 89th Congress as S. 961-968 and were the subject of extensive hearings by the Subcommittee. Hearings on S. 961-968 and S. J. Res. 40 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 89th Cong., 1st Sess. (1965) (hereinafter cited as 1965 Hearings).

S. 961 would have extended to tribal governments all constitutional provisions applicable to the Federal Government. After criticism of this proposal at the hearings, Congress instead adopted the approach found in a substitute bill submitted by the Interior Department, reprinted in 1965 Hearings 318, which, with some changes in wording, was enacted into law as 25 U.S.C. 1302-1303. See also n. 1, supra.

[ Footnote 13 ] See, e. g., Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, Constitutional Rights of the American Indian: Summary Report of Hearings and Investigations Pursuant to S. Res. 194, 89th Cong., 2d Sess., 8-11, 25 (Comm. Print 1966); 1965 Hearings 17, 21, 50 (statements of Solicitor of the Dept. of Interior); id., at 65 (statement of Arthur Lazarus, Jr., General Counsel for the Association of American Indian Affairs).

[ Footnote 14 ] The provisions of 1302, set forth fully in n. 8, supra, differ in language and in substance in many other respects from those contained in the constitutional provisions on which they were modeled. The provisions of the Second and Third Amendments, in addition to those of the Seventh Amendment, were omitted entirely. The provision here at issue, 1302 (8), differs from the constitutional Equal Protection Clause in that it guarantees "the equal protection of its [the tribe's] laws," rather than of "the laws." Moreover, 1302 (7), which prohibits cruel or unusual punishments and excessive bails, sets an absolute limit of six months' imprisonment and a $500 fine on penalties which a tribe may impose. Finally, while most of the guarantees of the Fifth Amendment were extended to tribal actions, it is interesting to note that 1302 does not require tribal criminal prosecutions to be initiated by grand jury indictment, which was the requirement of the Fifth Amendment specifically at issue and found inapplicable to tribes in Talton v. Mayes, discussed supra, at 56.

[ Footnote 15 ] See, e. g., 114 Cong. Rec. 9596 (1968) (remarks of Rep. Meeds); Hearings on H. R. 15419 before the Subcommittee on Indian Affairs of the House Committee on Interior & Insular Affairs, 90th Cong., 2d Sess., 108 (1968) (hereinafter cited as House Hearings). See also 1965 Hearings 198 (remarks of Executive Director, National Congress of American Indians).

[ Footnote 16 ] In 25 U.S.C. 1323 (b), Congress expressly repealed 7 of the Act of Aug. 15, 1953, 67 Stat. 590, which had authorized States to assume criminal and civil jurisdiction over reservations without tribal consent.

[ Footnote 17 ] Title II of the ICRA provides, inter alia, "for the establishing of educational classes for the training of judges of courts of Indian offenses." 25 U.S.C. 1311 (4). Courts of Indian offenses were created by the Federal Bureau of Indian Affairs to administer criminal justice for those tribes lacking their own criminal courts. See generally W. Hagan, Indian Police and Judges 104-125 (1966).

[ Footnote 18 ] Under 25 U.S.C. 81, the Secretary of the Interior and the Commissioner of Indian Affairs are generally required to approve any contract made between a tribe and an attorney. At the exploratory hearings, see n. 12, supra, it became apparent that the Interior Department had engaged in inordinate delays in approving such contracts and had thereby hindered the tribes in defending and asserting their legal rights. See, e. g., Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary pursuant to S. Res. 53, 87th Cong., 1st Sess., 211 (1961) (hereinafter cited as 1961 Hearings); id., at 290, 341, 410. Title V of the ICRA, 25 U.S.C. 1331, provides that the Department must act on applications for approval of attorney contracts within 90 days of their submission or the application will be deemed to have been granted.

[ Footnote 19 ] The cost of civil litigation in federal district courts, in many instances located far from the reservations, doubtless exceeds that in most tribal forums. See generally 1 American Indian Policy Review Commission, Final Report 160-166 (1977); M. Price, Law and the American Indian 154-160 (1973). And as became apparent in congressional hearings on the ICRA, many of the poorer tribes with limited resources and income could ill afford to shoulder the burdens of defending federal lawsuits. See, e. g., 1965 Hearings 131, 157; Summary Report 12; House Hearings 69 (remarks of the Governor of the San Felipe Pueblo).

[ Footnote 20 ] Prior to passage of the ICRA, Congress made detailed inquiries into the extent to which tribal constitutions incorporated "Bill of Rights" guarantees, and the degree to which the tribal provisions differed from those found in the Constitution. See, e. g., 1961 Hearings 121, 166, 359; Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary pursuant to S. Res. 58, 88th Cong., 1st Sess., 823 (1963). Both Senator Ervin, the ICRA's chief sponsor, and President Johnson, in urging passage of the Act, explained the need for Title I on the ground that few tribal constitutions included provisions of the Bill of Rights. See House Hearings 131 (remarks of Sen. Ervin); 114 Cong. Rec. 5520 (1968) (message from the President).

[ Footnote 21 ] There are 287 tribal governments in operation in the United States, of which 117 had operating tribal courts in 1976. 1 American Indian Policy Review Commission, supra n. 19, at 5, 163. In 1973 these courts [436 U.S. 49, 66]   handled approximately 70,000 cases. Id., at 163-164. Judgments of tribal courts, as to matters properly within their jurisdiction, have been regarded in some circumstances as entitled to full faith and credit in other courts. See, e. g., United States ex rel. Mackey v. Coxe, 18 How. 100 (1856); Standley v. Roberts, 59 F. 836, 845 (CA8 1894), appeal dismissed, 17 S. Ct. 999, 41 L. Ed. 1177 (1896).

[ Footnote 22 ] By the terms of its Constitution, adopted in 1935 and approved by the Secretary of the Interior in accordance with the Indian Reorganization Act of 1934, 25 U.S.C. 476, judicial authority in the Santa Clara Pueblo is vested in its tribal council.

Many tribal constitutions adopted pursuant to 25 U.S.C. 476, though not that of the Santa Clara Pueblo, include provisions requiring that tribal ordinances not be given effect until the Department of Interior gives its approval. See 1 American Indian Policy Review Commission, supra n. 19, at 187-188; 1961 Hearings 95. In these instances, persons aggrieved by tribal laws may, in addition to pursuing tribal remedies, be able to seek relief from the Department of the Interior.

[ Footnote 23 ] See n. 12, supra. Although extensive hearings on the ICRA were held in the Senate, see ibid., House consideration was extremely abbreviated. See House Hearings, supra; 114 Cong. Rec. 9614-9615 (1968) (remarks of Rep. Aspinall).

[ Footnote 24 ] S. 962, 89th Cong., 1st Sess. (1965), reprinted in 1965 Hearings 6-7. See n. 12, supra.

[ Footnote 25 ] S. 963, 89th Cong., 1st Sess. (1965). See n. 12, supra.

[ Footnote 26 ] The Interior Department substitute, reprinted in 1965 Hearings 318, provided in relevant part:

> "Any action, other than a criminal action, taken by an Indian tribal government which deprives any American Indian of a right or freedom established and protected by this Act may be reviewed by the Secretary of the Interior upon his own motion or upon the request of said Indian. If [436 U.S. 49, 69] the Secretary determines that said Indian has been deprived of any such right or freedom, he shall require the Indian tribal government to take such corrective action as he deems necessary. Any final decision of the Secretary may be reviewed by the United States district court in the district in which the action arose and such court shall have jurisdiction thereof."

In urging Congress to adopt this proposal, the Solicitor of Interior specifically suggested that "Congress has the power to give to the courts the jurisdiction that they would require to review the actions of an Indian tribal court," and that the substitute bill which the Department proposed "would actually confer on the district courts the jurisdiction they require to consider these problems." Id., at 23-24. Congress' failure to adopt this provision is noteworthy particularly because it did adopt the other portion of the Interior substitute bill, which led to the current version of 1302 and 1303. See n. 12, supra.

[ Footnote 27 ] Respondents rely most heavily on a rambling passage in the Report discussing Talton v. Mayes and its progeny, see n. 7, supra, some of which arose in a civil context. S. Rep. No. 841, at 8-11. Although there is some language suggesting that Congress was concerned about the unavailability of relief in federal court, the Report nowhere states that Title I would be enforceable in a cause of action for declaratory or injunctive relief, and the cited passage is fully consistent with the conclusion that Congress intended only to modify the substance of the law applicable to Indian tribes, and to allow enforcement in federal court through habeas corpus. The Report itself characterized the import of its discussion as follows:

> "These cases illustrate the continued denial of specific constitutional guarantees to litigants in tribal court proceedings, on the ground that the tribal courts are quasi-sovereign entities to which general provisions in the Constitution do not apply." Id., at 10.

[ Footnote 28 ] The Report states: "The purpose of title I is to protect individual Indians from arbitrary and unjust actions by tribal governments. This [436 U.S. 49, 70]  is accomplished by placing certain limitations on an Indian tribe in the exercise of its powers of self-government." Id., at 6. It explains further that "[i]t is hoped that title II [25 U.S.C. 1311], requiring the Secretary of the Interior to recommend a model code [to govern the administration of justice] for all Indian tribes, will implement the effect of title I." Ibid. (Although 1311 by its terms refers only to courts of Indian offenses, see n. 17, supra, the Senate Report makes clear that the code is intended to serve as a model for use in all tribal courts. S. Rep. No. 841, supra, at 6, 11.) Thus, it appears that the Committee viewed 1302 as enforceable only on habeas corpus and in tribal forums.

[ Footnote 29 ] Senator Ervin described the model code provisions of Title II, see n. 28, supra, as "the proper vehicle by which the objectives" of Title I should be achieved. 113 Cong. Rec. 13475 (1967). And Congressman Reifel, one of the ICRA's chief supporters in the House, explained that "by providing for a writ of habeas corpus from the Federal court, the bill would assure effective enforcement of these fundamental rights." 114 Cong. Rec. 9553 (1968).

[ Footnote 30 ] Only a few tribes had an opportunity to comment on the ICRA in its final form, since the House held only one day of hearings on the legislation. See n. 23, supra. The Pueblos of New Mexico, testifying in opposition to the provisions of Title I, argued that the habeas corpus provision of 1303 "opens an avenue through which Federal courts, lacking knowledge of our traditional values, customs, and laws, could review and offset the decisions of our tribal councils." House Hearings 37. It is inconceivable that, had they understood the bill impliedly to authorize other actions, they would have remained silent, as they did, concerning this possibility. It would hardly be consistent with "[t]he overriding duty of our Federal Government to deal fairly with Indians," Morton v. Ruiz, 415 U.S. 199, 236 (1974), lightly to imply a cause of action on which the tribes had no prior opportunity to present their views.

[ Footnote 31 ] See generally Burnett, An Historical Analysis of the 1968 "Indian Civil Rights" Act, 9 Harv. J. Legis. 557, 574-602, 603 (1972).

[ Footnote 32 ] A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community. See Roff v. Burney, 168 U.S. 218 (1897); Cherokee Intermarriage Cases, 203 U.S. 76 (1906). Given the often vast gulf between tribal traditions and those with which federal courts are more intimately familiar, the judiciary should not rush to create causes of action that would intrude on these delicate matters.

MR. JUSTICE WHITE, dissenting.

The declared purpose of the Indian Civil Rights Act of 1968 (ICRA or Act), 25 U.S.C. 1301-1341, is "to insure that the American Indian is afforded the broad constitutional rights secured to other Americans." S. Rep. No. 841, 90th [436 U.S. 49, 73]   Cong., 1st Sess., 6 (1967) (hereinafter Senate Report). The Court today, by denying a federal forum to Indians who allege that their rights under the ICRA have been denied by their tribes, substantially undermines the goal of the ICRA and in particular frustrates Title I's 1 purpose of "protect[ing] individual Indians from arbitrary and unjust actions of tribal governments." Ibid. Because I believe that implicit within Title I's declaration of constitutional rights is the authorization for an individual Indian to bring a civil action in federal court against tribal officials 2 for declaratory and injunctive relief to enforce those provisions. I dissent.

Under 28 U.S.C. 1343 (4), federal district courts have jurisdiction over "any civil action authorized by law to be commenced by any person . . . [t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote." Because the ICRA is unquestionably a federal Act "providing for the protection of civil rights," the necessary inquiry is whether the Act authorizes the commencement of a civil action for such relief.

The Court noted in Bell v. Hood, 327 U.S. 678, 684 (1946) (footnote omitted), that "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." The fact that a statute is merely declarative and does not expressly provide for a cause of action to enforce its terms "does not, of course, prevent a federal court from fashioning an effective equitable remedy," [436 U.S. 49, 74]   Jones v. Alfred H. Mayer Co., 392 U.S. 409, 414 n. 13 (1968), for "[t]he existence of a statutory right implies the existence of all necessary and appropriate remedies." Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 239 (1969). We have previously identified the factors that are relevant in determining whether a private remedy is implicit in a statute not expressly providing one: whether the plaintiff is one of the class for whose especial benefit the statute was enacted; whether there is any indication of legislative intent either to create a remedy or to deny one; whether such a remedy is consistent with the underlying purposes of the statute; and whether the cause of

action is one traditionally relegated to state law. Cort v. Ash, 422 U.S. 66, 78 (1975). Application of these factors in the present context indicates that a private cause of action under Title I of the ICRA should be inferred.

As the majority readily concedes, "respondents, American Indians living on the Santa Clara reservation, are among the class for whose especial benefit this legislation was enacted." Ante, at 61. In spite of this recognition of the congressional intent to provide these particular respondents with the guarantee of equal protection of the laws, the Court denies them access to the federal courts to enforce this right because it concludes that Congress intended habeas corpus to be the exclusive remedy under Title I. My reading of the statute and the legislative history convinces me that Congress did not intend to deny a private cause of action to enforce the rights granted under 1302.

The ICRA itself gives no indication that the constitutional rights it extends to American Indians are to be enforced only by means of federal habeas corpus actions. On the contrary, since several of the specified rights are most frequently invoked in noncustodial situations, 3 the natural assumption is [436 U.S. 49, 75] that some remedy other than habeas corpus must be contemplated. This assumption is not dispelled by the fact that the Congress chose to enumerate specifically the rights granted under 1302, rather than to state broadly, as was originally proposed, that "any Indian tribe in exercising its powers of local self-government shall be subject to the same limitations and restraints as those which are imposed on the Government of the United States by the United States Constitution." S. 961, 89th Cong., 1st Sess. (1965). The legislative history reflects that the decision "to indicate in more specific terms the constitutional protections the American Indian possesses in relation to his tribe," was made in recognition of the "peculiarities of the Indian's economic and social condition, his customs, his beliefs, and his attitudes . . . ." Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, Constitutional Rights of the American Indian: Summary Report of Hearings and Investigations pursuant to S. Res. 194, 89th Cong., 2d Sess., 25, 9 (Comm. Print 1966) (hereinafter Summary Report). While I believe that the uniqueness of the Indian culture must be taken into consideration in applying the constitutional rights granted in 1302, I do not think that it requires insulation of official tribal actions from federal-court scrutiny. Nor do I find any indication that Congress so intended.

The inferences that the majority draws from various changes Congress made in the originally proposed legislation are to my mind unsupported by the legislative history. The first change the Court points to is the substitution of a habeas corpus provision for S. 962's provision of de novo federal-court review of tribal criminal proceedings. See ante, at 67. This change, restricted in its concern to the criminal context, is of limited relevance to the question whether Congress intended a private cause of action to enforce rights arising in a civil context. Moreover, the reasons this change was made are not inconsistent with the recognition of such a cause of action. [436 U.S. 49, 76] The Summary Report explains that the change in S. 962 was made only because of displeasure with the degree of intrusion permitted by the original provision:

> "No one appearing before the subcommittee or submitting testimony for the subcommittee's consideration opposed the provision of some type of appeal from the decisions of tribal courts. Criticism of S. 962, however, was directed at the bill's use of a trial de novo in a U.S. district court as the appropriate means of securing appellate review. . . .
> . . . . .
> "There was considerable support for the suggestion that the district court, instead of reviewing tribal court decisions on a de novo basis, be authorized only to decide whether the accused was deprived of a constitutional right. If no deprivation were found, the tribal court decision would stand. If, on the other hand, the district court determined that an accused had suffered a denial of his rights at the hands of the tribal court, the case would be remanded with instructions for dismissal or retrial, as the district court might decide." Summary Report 12-13 (footnote omitted).

The degree of intrusion permitted by a private cause of action to enforce the civil provisions of 1302 would be no greater than that permitted in a habeas corpus proceeding. The federal district court's duty would be limited to determining whether the challenged tribal action violated one of the enumerated rights. If found to be in violation, the action would be invalidated; if not, it would be allowed to stand. In no event would

the court be authorized, as in a de novo review proceeding, to substitute its judgment concerning the wisdom of the action taken for that of the tribal authorities.

Nor am I persuaded that Congress, by rejecting various proposals for administrative review of alleged violations of Indian [436 U.S. 49, 77] rights, indicated its rejection of federal judicial review of such violations. As the majority notes, the original version of the Act provided for investigation by the Attorney General of "any written complaint filed with him by any Indian . . . alleging that such Indian has been deprived of a right conferred upon citizens of the United States by the laws and Constitution of the United States." S. 963, 89th Cong., 1st Sess. (1965). The bill would have authorized the Attorney General to bring whatever action he deemed appropriate to vindicate such right. Although it is true that this provision was eliminated from the final version of the ICRA, the inference the majority seeks to draw from this fact is unwarranted.

It should first be noted that the focus of S. 963 was in large part aimed at nontribal deprivations of Indian rights. In explaining the need for the bill, the Subcommittee stated that it had received complaints of deprivations of Indians' constitutional rights in the following contexts, only two of which concern tribal actions: "[I]llegal detention of reservation Indians by State and tribal officials; arbitrary decisionmaking by the Bureau of Indian Affairs; denial of various State welfare services to Indians living off the reservations; discrimination by government officials in health services; mistreatment and brutality against Indians by State and tribal law enforcement officers; and job discrimination by Federal and State agencies and private businesses." Hearings on S. 961-968 and S. J. Res. 40 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 89th Cong., 1st Sess., 8 (1965) (hereinafter 1965 Hearings). See also id., at 86 (testimony of Arthur Lazarus, Jr., General Counsel for the Association on American Indian Affairs, Inc.: "It is my understanding . . . that the complaints to be filed with the Attorney General are generally to be off-reservation violations of rights along the lines of the provisions in the Civil Rights Act"). Given this difference in focus, the elimination of this proposal has little relevance to the issue before us. [436 U.S. 49, 78]

Furthermore, the reasons for the proposal's deletion are not as clear as the majority seems to indicate. While two witnesses did express their fears that the proposal would disrupt tribal governments, many others expressed the view that the proposals gave the Attorney General no more authority than he already possessed. Id., at 92, 104, 227, 319. The Acting Secretary of the Interior was among those who thought that this additional authorization was not needed by the Attorney General because the Department of the Interior already routinely referred complaints of Indian rights violations to him for the commencement of appropriate litigation. Id., at 319.

The failure of Congress to adopt the Department of the Interior's substitute provision provides even less support for the view that Congress opposed a private cause of action. This proposal would have allowed the Secretary of the Interior to review "[a]ny action, other than a criminal action, taken by an Indian tribal government which deprives any American Indian of a right or freedom established and protected by this Act . . ." and to take "such corrective action" as he deemed necessary. Id., at 318. It was proposed in tandem with a provision that would have allowed an Indian to appeal from a criminal conviction in a tribal court to the Secretary, who would then have been authorized to affirm, modify, or reverse the tribal court's decision. Most of the discussion about this joint proposal focused on the review of criminal proceedings, and several witnesses expressed objection to it because it improperly "mixed" "the judicial process . . . with the executive process." Id., at 96. See also id., at 294. Senator Ervin himself stated that he had "difficulty reconciling [his] ideas of the nature of the judicial process and the notion of taking an appeal in what is supposed to be a judicial proceeding to the executive branch of the Government." Id., at 225. While the discussion of the civil part of the proposal was limited, it may be assumed that Congress was equally unreceptive to the [436 U.S. 49, 79] idea of the Executive Branch's taking "corrective actions" with regard to noncriminal actions of tribal governments.

In sum, then, I find no positive indication in the legislative history that Congress opposed a private cause of action to enforce the rights extended to Indians under 1302. 4 The absence of any express approval of such a cause of action, of course, does not prohibit its inference, for, as we stated in Cort: "[I]n situations in

which it is clear that federal law has granted a class of persons certain rights, it is not necessary to show an intention to create a private cause of action, although an explicit purpose to deny such cause of action would be controlling." 422 U.S., at 82 (footnote omitted).

The most important consideration, of course, is whether a private cause of action would be consistent with the underlying [436 U.S. 49, 80]   purposes of the Act. As noted at the outset, the Senate Report states that the purpose of the ICRA "is to insure that the American Indian is afforded the broad constitutional rights secured to other Americans." Senate Report 6. Not only is a private cause of action consistent with that purpose, it is necessary for its achievement. The legislative history indicates that Congress was concerned, not only about the Indian's lack of substantive rights, but also about the lack of remedies to enforce whatever rights the Indian might have. During its consideration of this legislation, the Senate Subcommittee pointed out that "[t]hough protected against abridgment of his rights by State or Federal action, the individual Indian is . . . without redress against his tribal authorities." Summary Report 3. It is clear that the Subcommittee's concern was not limited to the criminal context, for it explained:

> "It is not only in the operation of tribal courts that Indians enjoy something other than full benefit of the Bill of Rights. For example, a Navajo tribal council ordinance prohibiting the use of peyote resulted in an alleged abridgment of religious freedom when applied to members of the Native American Church, an Indian sect which uses the cactus plant in connection with its worship services.
> "The opinion of the U.S. Court of Appeals for the 10th Circuit, in dismissing an action of the Native American Church against the Navajo tribal council, is instructive in pointing up the lack of remedies available to the Indian in resolving his differences with tribal officials." Id., at 3-4 (footnotes omitted). 5   [436 U.S. 49, 81]

It was "[t]o remedy these various situations and thereby to safeguard the rights of Indian citizens . . ." that the legislation resulting in the ICRA was proposed. Id., at 5.

Several witnesses appearing before the Senate Subcommittee testified concerning deprivations of their rights by tribal authorities and their inability to gain relief. Mr. Frank Takes Gun, President of the Native American Church, for example, stated that "the Indian is without an effective means to enforce whatever constitutional rights he may have in tribal proceedings instituted to deprive him of liberty or property. While I suppose that abstractedly [sic] we might be said to enjoy [certain] rights . . ., the blunt fact is that unless the tribal court elects to confer that right upon us we have no way of securing it." 1965 Hearings 164. Miss Emily Schuler, who accompanied a former Governor of the Isleta Pueblo to the hearings, echoed these concerns. She complained that "[t]he people get governors and sometimes they get power hungry and then the people have no rights at all," to which Senator Ervin responded: "`Power hungry' is a pretty good shorthand statement to show why the people of the United States drew up a Constitution. They wanted to compel their rulers to [436 U.S. 49, 82]   stay within the bounds of that Constitution and not let that hunger for power carry them outside it." Id., at 264.

Given Congress' concern about the deprivations of Indian rights by tribal authorities, I cannot believe, as does the majority, that it desired the enforcement of these rights to be left up to the very tribal authorities alleged to have violated them. In the case of the Santa Clara Pueblo, for example, both legislative and judicial powers are vested in the same body, the Pueblo Council. See App. 3-5. To suggest that this tribal body is the "appropriate" forum for the adjudication of alleged violations of the ICRA is to ignore both reality and Congress' desire to provide a means of redress to Indians aggrieved by their tribal leaders. 6

Although the Senate Report's statement of the purpose of the ICRA refers only to the granting of constitutional rights to the Indians, I agree with the majority that the legislative history demonstrates that Congress was also concerned with furthering Indian self-government. I do not agree, however, that this concern on the part of Congress precludes our recognition of a federal cause of action to enforce the terms of the Act. The major intrusion upon the tribe's right to govern itself occurred when Congress enacted the ICRA and mandated [436 U.S. 49, 83]   that the tribe "in exercising powers of self-government" observe the rights enumerated in 1302. The extension of constitutional rights to individual citizens is intended to intrude upon the authority of government. And once it has been decided that an individual does possess

certain rights vis-a-vis his government, it necessarily follows that he has some way to enforce those rights. Although creating a federal cause of action may "constitut[e] an interference with tribal autonomy and self-government beyond that created by the change in substantive law itself," ante, at 59, in my mind it is a further step that must be taken; otherwise, the change in the law may be meaningless.

The final consideration suggested in Cort is the appropriateness of a federal forum to vindicate the right in question. As even the majority acknowledges, "we have frequently recognized the propriety of inferring a federal cause of action for the enforcement of civil rights . . . ." Ante, at 61. For the reasons set out above, I would make no exception here.

Because I believe that respondents stated a cause of action over which the federal courts have jurisdiction, I would proceed to the merits of their claim. Accordingly, I dissent from the opinion of the Court.

[ Footnote 1 ] 25 U.S.C. 1301-1303.

[ Footnote 2 ] Because the ICRA is silent on the question, I agree with the Court that the Act does not constitute a waiver of the Pueblo's sovereign immunity. The relief respondents seek, however, is available against petitioner Lucario Padilla, the Governor of the Pueblo. Under the Santa Clara Constitution, the Governor is charged with the duty of enforcing the Pueblo's laws. App. 5.

[ Footnote 3 ] For example, habeas corpus relief is unlikely to be available to redress violations of freedom of speech, freedom of the press, free exercise of religion, or just compensation for the taking of property.

[ Footnote 4 ] References in the legislative history to the role of Title II's model code in effectuating the purposes of Title I do not indicate that Congress rejected the possibility of a federal cause of action under 1302. The wording of 1311, which directs the Secretary of the Interior to recommend a model code, demonstrates that in enacting Title II Congress was primarily concerned with criminal proceedings. Thus it requires the code to include

> "provisions which will (1) assure that any individual being tried for an offense by a court of Indian offenses shall have the same rights, privileges, and immunities under the United States Constitution as would be guaranteed any citizen of the United States being tried in a Federal court for any similar offense, (2) assure that any individual being tried for an offense by a court of Indian offenses will be advised and made aware of his rights under the United States Constitution, and under any tribal constitution applicable to such individual . . . ."

The remaining required provisions concern the qualifications for office of judges of courts of Indian offenses and educational classes for the training of such judges. While the enactment of Title II shows Congress' desire to implement the provisions of 1302 concerning rights of criminal defendants and to upgrade the quality of tribal judicial proceedings, it gives no indication that Congress decided to deny a federal cause of action to review tribal actions arising in a noncriminal context.

[ Footnote 5 ] The opinion to which the Subcommittee was referring was Native American Church v. Navajo Tribal Council, 272 F.2d 131 (CA10 1959), in which the court dismissed for lack of federal jurisdiction an action challenging a Navajo tribal ordinance making it a criminal offense "to introduce into the Navajo country, sell, use or have in possession within the Navajo country, the bean known as peyote . . . ." Id., at 132. It was [436 U.S. 49, 81]   contended that the ordinance violated plaintiffs' right to the free exercise of religion. Because the court concluded that the First Amendment was not applicable to the tribe, it held that the federal courts lacked jurisdiction, "even though [the tribal laws or regulations] may have an impact to some extent on forms of religious worship." Id., at 135.

The Senate Report also made note of this decision in what the majority terms a "rambling passage." Ante, at 69 n. 27. In this passage the Committee reviewed various federal decisions relating to the question "whether a tribal Indian can successfully challenge on constitutional grounds specific acts or practices of the Indian tribe." Senate Report 9. With only one exception, these decisions held that federal courts lacked

jurisdiction to review alleged constitutional violations by tribal officials because the provisions of the Bill of Rights were not binding on the tribes. This section of the Senate Report, which is included under the heading "Need for Legislation," indicates Congress' concern over the Indian's lack of remedies for tribal constitutional violations.

[ Footnote 6 ] Testimony before the Subcommittee indicated that the mere provision of constitutional rights to the tribes did not necessarily guarantee that those rights would be observed. Mr. Lawrence Jaramillo, a former Governor of the Isleta Pueblo, testified that, despite the tribal constitution's guarantee of freedom of religion, the present tribal Governor had attempted to "alter certain religious procedures of the Catholic priest who resides on the reservation." 1965 Hearings 261, 264. Mr. Jaramillo stated that the Governor "has been making his own laws and he has been making his own decisions and he has been making his own court rulings," and he implored the Subcommittee:

> "Honorable Senator Ervin, we ask you to see if we can have any protection on these constitutional rights. We do not want to give jurisdiction to the State. We want to keep it in Federal jurisdiction. But we are asking this. We know if we are not given justice that we would like to appeal a case to the Federal court." Id., at 264. [436 U.S. 49, 84]